George R. BENDER, Plaintiff,

v.

CENTRUST MORTGAGE CORP., a California corporation, and Resolution Trust Corp., Conservator/Receiver for CenTrust Bank Professional Regulation, Defendants.

No. 91–2521–CIV.

United States District Court,
S.D. Florida.

July 6, 1992.

Timothy D. Naegel, Washington, DC, John E. Herndon, Jr., Hollywood, FL, for plaintiff.

Alan J. Kluger, Miami, FL, for defendants.

### ORDER ON MOTIONS TO DISMISS AND FOR MORE DEFINITE STATEMENT

MARCUS, District Judge.

THIS CAUSE comes before the Court upon CenTrust Mortgage Corporation's Motion to Dismiss the First Amended Complaint, [and] Motion for More Definite Statement [etc.], filed February 5, 1992, and Resolution Trust Corporation's Motion to Dismiss the First Amended Complaint [and] Motion for More Definite Statement [etc.], filed February 18, 1992. In addition to the response and reply briefs, with leave of the Court, Plaintiff filed a response to Defendants' replies, and Defendants' filed supplemental responses thereto. Plaintiff is the former President of CenTrust Mortgage Co. ("CenTrust Mortgage"), which was a wholly owned subsidiary of CenTrust Bank, and he seeks to recover on a variety of claims arising out of his alleged employment relationship with the CenTrust entities.

Plaintiff alleges that on or about June 10, 1985, George Bender entered into an employment contract in which he agreed to serve as the Chief Executive Officer of CenTrust Mortgage. *See* First Amended Complaint at ¶ 7. Pursuant to the employment contract, Bender was to be paid an annual salary, retirement benefits, an initial bonus, and annual incentive bonus, and a long-term incentive bonus. *See id.* Despite the fact that the contract named Bender and CenTrust Bank as the parties, and that only Bender and the Chief, Executive Officer of CenTrust Bank signed the contract, Plaintiff maintains that it was the intent of the signers that CenTrust Bank and its subsidiary CenTrust Mortgage be jointly and severally liable for compensation owed Bender. First Amended Complaint at ¶ 9. On February 2, 1990, the Director of the Office of Thrift Supervision took possession of CenTrust Bank and appointed the Resolution Trust Corporation ("RTC") as Conservator of the bank. The RTC repudiated Bender's contract on February 5, 1990.

Plaintiff has filed an eleven count complaint seeking a variety of relief. Significantly, Plaintiff attempts to distinguish CenTrust Bank from CenTrust Mortgage and seeks to impose liability upon CenTrust Mortgage. Count I is an action for breach of contract against Centrust Mortgage. Count II is a second action for breach of contract against Centrust Mortgage, based upon third party beneficiary theory. Count III is a breach of contract action against the RTC. Count IV is a claim for quantum meruit recovery against Centrust Mortgage. Count V is a

count in quantum meruit against the RTC. Count VI alleges a breach of contract against Centrust Mortgage based on estoppel theory. Count VII is an action for breach of fiduciary duty against Centrust Mortgage. Count VIII is an action for reformation of contract against RTC. Count IX is an action for improper repudiation of the employment contract against the RTC, alleging that RTC abused its discretion in repudiating the employment contract. Count X is a count for tortious interference raised against persons unknown, for improperly causing Bender's termination. Finally, Count XI seeks the imposition of a constructive trust against CenTrust Mortgage and in favor of Bender.

For the reasons detailed below, Defendants' motions to dismiss are DENIED as to Counts I, II, III, IV, V, VI, VII, VIII, IX, and X, and GRANTED as to Count XI, and Defendants' motions for more definite statement are DENIED as to Counts I, III, IV, V, VI, VII, VIII, IX, X, and XI, and GRANTED as to Count II.

## I. The Motion to Dismiss Standard

Defendants by these motions seek to dismiss all counts except Count IX's wrongful repudiation claim. A 12(b)(6) motion tests the facial sufficiency of the statement of claim for relief. As the Eleventh Circuit wrote in *Jackam v. Hospital Corp. of America Mideast Ltd.*, the issue is not whether the plaintiffs will prevail ultimately, "but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove their allegations." 800 F.2d 1577, 1579 (11th Cir.1986). In addition, a motion to dismiss must be considered in light of Rule 8(a) of the Federal Rules of Civil Procedure which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)

The rule is not designed to strike inartistic pleadings or to provide a more definite statement to answer an apparent ambiguity, and the analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1356 at 590–92 (1969). Moreover, for the purposes of the motion to dismiss, the com-

plaint must be construed in a light most favorable to the plaintiff and the factual allegations taken as true. *See SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.), *cert. denied, Peat Marwick Main & Co. v. Tew*, 486 U.S. 1055, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988).

 The Eleventh Circuit has recently written:

> [T]he Supreme Court has stated that the "accepted rule" for appraising the sufficiency of a complaint is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99 [101–02], 2 L.Ed.2d 80 (1957); *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1117–18 (11th Cir.1986) (quoting *Conley* ).

*Id.* A complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on any possible theory. *Robertson v. Johnston*, 376 F.2d 43 (5th Cir.1967). We hasten to add that this motion is viewed with disfavor and rarely granted. *See e.g., Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir.1969); *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Service*, 400 F.2d 465, 471 (5th Cir.1968) ("Dismissal of a claim on the basis of barebone pleadings is a precarious disposition with a high mortality rate."). The pleadings must show, in short, that Plaintiff has no claim before the 12(b)(6) motion may be granted. It is against this standard that we consider Defendants' motion to dismiss.

Defendants have also moved for a more definite statement. The Eleventh Circuit considered the interaction of a motion to dismiss for failure to state a claim and a motion for more definite statement in *Barnett v. Bailey*, 956 F.2d 1036 (11th Cir.1992):

> Under circumstances where, as here, a complaint may not have contained sufficient information to allow a responsive pleading to be framed, "a district court should give a plaintiff an opportunity to

amend his complaint rather than dismiss it when it appears that a more carefully drafted complaint might state a claim upon which relief could be granted." *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir. 1985), *citing Conley v. Gibson, supra. See also Sisk v. Texas Parks and Wildlife Department*, 644 F.2d 1056, 1059 (5th Cir. 1981) ("[i]f a complaint is ambiguous or does not contain sufficient information to allow a responsive pleading to be framed, the proper remedy is a motion for a more definite statement under Rule 12(e) F.R.C.P.....")

Fed.R.Civ.P. 12(e) provides as follows:

If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

Fed.R.Civ.P 12(e).

## II. *D'Oench, Duhme and Related Statutory Provisions*

Defendants have asserted various state and federal grounds for dismissal. The predominant point of contention between the parties, and the major focus of the memoranda filed regarding these motions, has been the extent to which *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), its progeny, and 12 U.S.C. § 1823(e) bar enforcement of the employment contract against CenTrust mortgage. *See* 12 U.S.C.A. § 1823(e) (West 1989). Because we have serious doubts as to whether *D'Oench* and its statutory companions apply to the facts of this case, we decline now to grant the motions to dismiss based on the *D'Oench* doctrine arguments.

In *D'Oench* the Supreme Court considered a situation in which a bank and notemaker had an unwritten understanding that the bank would not enforce the note. *D'Oench*, 315 U.S. at 454, 62 S.Ct. at 678. The FDIC subsequently attempted to collect on the note, and the notemaker contended that he was not required to pay, pursuant to his unwritten agreement with the bank. The Supreme Court held that the FDIC was not bound by the secret agreement, and wrote that there exists "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679. As the Eleventh Circuit explained in *Vernon v. Resolution Trust Corporation*, 907 F.2d 1101 (11th Cir.1990):

The purpose of the federal policy articulated by the Supreme Court in *D'Oench* is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when ... the FDIC is deciding whether to liquidate a failed bank or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank. The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

*Id.* at 1104–05 (quoting *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (quoting *Gunter v. Hutcheson*, 674 F.2d 862, 865 (11th Cir.) *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (citations omitted))).

Section 1823(e) of Title 12 provides a statutory analogue to the common law *D'Oench* doctrine. The section was originally enacted in 1950, eight years after *D'Oench*, and was incorporated by FIRREA in 1989. The only changes of note brought by FIRREA was the extension to apply to both the FDIC in

its corporate capacity and the FDIC as receiver, and to apply the section to the RTC as well. *See* 12 U.S.C.A. § 1441a(b)(4) (West Supp.1992). Section 1823(e) provides as follows:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 1989).

One focus of litigation involving section 1823(e) is an inquiry into what kind of interest in an asset must be at stake before 1823(e)'s requirements take effect. In this case, the RTC maintains that any diminution of assets of the insured depository institution is sufficient to bring a transaction under the requirements of section 1823(e). We observe that in *Vernon* the Eleventh Circuit declined the invitation to "extend the *D'Oench* doctrine to preserve all assets, whether actually possessed or receivable, acquired by a federal insurer or its successor in interest from all claims tending to diminish those assets, save those claims clearly supported by the records of the insolvent bank." 907 F.2d at 1108. *See In re NBW Commercial Paper Litig.,* 826 F.Supp. 1448, 1464 (D.D.C.1992). ("Under no circumstances should the term "asset," as used in § 1823(e) ] be interpreted so broadly as to encompass any liability or other existing condition which affects the financial condition of the receivership.").

Moreover, the interaction of *D'Oench* and section 1823(e) is complex. As the District Court for the District of Columbia recently observed:

Historically, courts have interpreted § 1823(e) and *D'Oench* together. Courts have routinely concluded that both would apply, and thus have found no need to distinguish the two. *See RTC v. Murray,* 935 F.2d 89, 93 n. 3 (5th Cir.1991); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1095 (N.D.Tex.1990) (citing cases). In most situations, such interpretation of two legal provisions does not pose a significant problem. In the context of federal common law, however, this sort of interpretation is an anomaly. If a statutory provision is exactly co-extensive with a doctrine of federal common law, the statute controls and the federal common law doctrine vanishes because there is no longer a need for it. Only if the common law doctrine is not co-extensive with the statute and the statute does not pre-empt it could the doctrine retain any vitality.

*In re NBW Commercial Paper Litig.,* 826 F.Supp. at 1458. Nonetheless, no court, either before or after the passage of FIRREA, has held that *D'Oench* has been displaced by section 1823(e), and indeed, the Eleventh Circuit has applied both. *See, e.g., Federal Sav. & Loan Ins. Corp. v. Gordy,* 928 F.2d 1558 (11th Cir.1991); *Victor Hotel Corp. v. FCA Mortgage Corp.,* 928 F.2d 1077, 1081–83 (11th Cir.1991); *Vernon,* 907 F.2d at 1105–08; *Federal Sav. and Loan Ins. Corp. v. Two Rivers Assocs., Inc.,* 880 F.2d 1267, 1275–77 (11th Cir.1989).

The Eleventh Circuit has observed, however, that the *D'Oench* doctrine and § 1823(e) are not coextensive. *See Vernon,* 907 F.2d at 1105 ("[T]he doctrine was partially codified at 12 U.S.C. section 1823(e). . . ."). In *Vernon* the Eleventh Circuit wrote:

Under section 1823(e), the courts have protected the FDIC from secret non-payment agreements, assertions of unwritten arrangements allegedly breached by the bank rendering the debt voidable, and— perhaps most significantly—claims that the

creation of the debt was fraudulently induced by the bank.

A far more expansive protection of federal bank insurers developed in the federal common law following *D'Oench*. The *D'Oench* doctrine has been held to protect the FDIC as receiver, the FSLIC in its receiver and corporate capacities, and entities which obtain the assets of the failed bank through purchase and assumption agreements with either federal receiver. Further, under *D'Oench* courts have protected these entities not only from secret or misleading schemes and agreements, but have created for them a quasi-holder-in-due-course status, whereby if the insurer purchases a note in a good faith transaction without knowledge of any wrongdoing involving the note, the insurer and its successors have a complete defense against, inter alia, claims of state and common law fraud, violation of state or federal securities laws, and the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration and usury.

*Vernon*, 907 F.2d at 1105–06 (citations omitted). The Eleventh Circuit has amplified this observation and stated as follows:

The exact relationship between *D'Oench* and section 1823(e) is unclear. *See* Note, Borrower Beware: *D'Oench, Duhme* and Section 1823 Overprotect the Insurer When Banks Fail, 62 S.Cal.L.Rev. 253, 271–73 (1988). However, at least one court has declared that "the *D'Oench* doctrine sweeps *more* broadly that [s]ection 1823(e)." *Hartigan v. Commonwealth Mortgage Corp. of America*, 723 F.Supp. 1258, 1261 (N.D.Ill.1989) (emphasis in original).

*Gordy*, 928 F.2d at 1562 n. 9. In addition, in *Victor Hotel Corp. v. FCA Mortgage Corp.* the Eleventh Circuit made clear that *D'Oench* applies to subsidiaries of federally insured banking institutions. 928 F.2d 1077, 1083 (11th Cir.1991) ("[T]he actual parties to the loan agreement is irrelevant in determining the applicability of *D'Oench*.").

Another statutory provision, 12 U.S.C. § 1821(d)(9)(A), which was added by FIRREA, also bears upon the enforceability of agreements against the RTC. The section provides

**(9) Agreement as basis of claim**

 **(A) Requirements**

Except as provided in subparagraph (B), any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation.

**(B) Exception to contemporaneous execution requirement**

Notwithstanding section 1823(e)(2) of this title, any agreement relating to an extension of credit between a Federal home loan bank or Federal Reserve bank and any insured depository institution which was executed before the extension of credit by such bank to such institution shall be treated as having been executed contemporaneously with such extension of credit for purposes of subparagraph (A).

12 U.S.C.A. § 1821(d)(9)(A) (West 1989). As a district court recently observed, "Post-FIRREA courts barring claims against the FDIC have almost exclusively based their decisions on § 1823(e) and *D'Oench*. Section 1821(d)(9)(A) ... explicitly incorporates the requirements of § 1823(e), but its meaning is by no means clear." *NBW Commercial Paper Litig.*, 826 F.Supp. at 1464.

The RTC urges us to rule that to the extent that an employment agreement between Bender and CenTrust Mortgage is not evident from the face of the Executive Employment Agreement appended to the complaint, or to the extent that anything other than a written agreement forms the basis for liability, *D'Oench* and § 1823(e) bar the enforceability of the agreement or liability on the claim. We have found no case applying section 1823(e) to an employment contract; indeed, the very language of 1823(e)(3) contemplates a financial transaction of some sort, requiring that a loan committee or the board of directors approve the obligation sought to be enforced against the entity, and that the approval be reflected in the corporate minutes. *See Vernon*, 907 F.2d at 1107 ("In every *D'Oench* doctrine case save one,

the FDIC, the FSLIC or some successor in interest asserted or defended the validity and enforceability of a particular debt or monetary obligation owed to a failed bank ...");
*North Arkansas Medical Center,* 962 F.2d 780, 787–89 (8th Cir.1992) (noting that few cases have extended *D'Oench* and § 1823(e) beyond creditor-debtor transactions). Additionally, in this case a writing does exist.

In short, a factual record may assist the Court in determining whether the *D'Oench* doctrine properly applies here. Furthermore, resolution of the issues discussed below, particularly the question of whether the repudiation of a contract by the RTC preempts state law claims against the RTC based upon that repudiation, may obviate the need to consider the substantial expansion of *D'Oench* urged by the RTC. Accordingly, we decline to dismiss now based upon *D'Oench,* § 1823(e) and § 1821(d)(9).

### III. Counts I and III

*a. Count I: Breach of Contract against CenTrust Mortgage*

■ In Count I of the Complaint Plaintiff alleges that by virtue of Bender's termination, CenTrust Mortgage committed a breach of contract. We begin our analysis with the written employment contract, which is appended to the First Amended Complaint. *See* Executive Employment Agreement, First Amended Complaint, Exhibit. In its preamble, the contract states: "EMPLOYMENT AGREEMENT made June 10, 1985 between CENTRUST SAVINGS BANK, a Florida chartered capital stock savings and loan association ("the Employer") and George R. Bender ("the Executive")." *Id.* The signers of the contract are David L. Paul, in his capacity as Chairman of the Board and Chief Executive Officer of CenTrust Savings Bank, and George R. Bender. No one signed the contract on behalf of CenTrust Mortgage.

Plaintiff relies primarily upon several provisions of the contract in an attempt to impose contractual liability upon CenTrust Mortgage. Plaintiff relies upon Section 9.5 of the employment agreement which provides as follows:

> Although this Agreement is between the Executive [George Bender] and the Employer [CenTrust Bank] and the Employer is liable for the performance of all its obligations hereunder, it is anticipated that the Executive's services shall be provided primarily to and for the benefit of the Company [CenTrust Mortgage] and its subsidiaries. The Company shall be charged with all the costs of this agreement or otherwise related to the Executive, unless it shall otherwise agree and any or all such costs may be paid directly by the Company as it and the Employer may agree.

Executive Employment Agreement ¶ 9.5; First Amended Complaint at ¶ 10. Bender further asserts that at all times he was paid by CenTrust Mortgage, and that the long-term bonus owed Bender under the employment agreement had been accounted for and set aside by CenTrust Mortgage. Bender asserts that the contractual provision and CenTrust Mortgage's conduct make CenTrust Mortgage a "co-obligor and/or guarantor of the payments promised to Bender...." First Amended Complaint at ¶ 10. Finally, Bender claims that the Bank was acting "as agent for Mortgage Company" in signing the employment agreement.

In addition, Plaintiff's response argues as follows:

> There is no question that CenTrust Mortgage was a named party to the employment contract which is at issue in this lawsuit. Specifically, as mentioned above, Bender was employed "to render full-time services to [it]" as its Chief Executive Officer (Section 1.1), and his services were to be provided "primarily to and for the benefit of [Mortgage] Company and its subsidiaries" (Section 9.5). The fact the Bank was a signatory to the contract reflected the fact that it was jointly liable, at the very least a guarantor or agent. Indeed, as mentioned above, the Mortgage Company was charged with "all costs of [the agreement] or otherwise related to the Executive" (paragraph 9.5), and it paid such costs in their entirety and booked other accrued costs as liabilities that were to be paid.....

Plaintiff's Opposition to CenTrust Mortgage Corporation's Motion to Dismiss [etc.] at ¶ 7.

In essence, Plaintiff has a written contract to which Plaintiff and CenTrust Bank were the signatories. Pursuant to the written contract, CenTrust Bank was obliged to cause its subsidiary, Centrust Mortgage, to pay Plaintiff various sums of money. As a matter of state law contract interpretation, the contract by its terms imposes no duty upon CenTrust Mortgage, and the subsidiary's failure to pay Bender does not give rise to a cause of action in Bender against CenTrust Mortgage for breach of the employment contract. Plaintiff has cited no authority for the proposition that because CenTrust Mortgage was charged with the payments, CenTrust Mortgage became obligated to make payments. Indeed, a reasonable reading of the contract makes clear that the contract is between CenTrust Bank and Bender.

Though it is clear that the thrust of Count I is to assert that CenTrust Mortgage breached the express employment contract, the Count alleges that CenTrust Mortgage "impliedly by its acts and deeds, promised to pay Bender for said services." First Amended Complaint at ¶ 19. Bender's response to the motion to dismiss does not address Count I as if it were on an implied contract theory, and cites no cases in support of a contract-by-implication theory. To the extent that this assertion could be thought an attempt to make out a claim in quasi-contract, for quantum meruit recovery, we consider it in our discussion of Count IV, which explicitly raises a quantum meruit claim against CenTrust Mortgage.

■ Despite our conclusion that the employment contract is between Bender and CenTrust Bank, Plaintiff's allegations of agency are sufficient now to survive a motion to dismiss on state law grounds. *See* First Amended Complaint at ¶ 9. If in fact Cen-Trust Bank was acting as CenTrust Mortgage's agent in signing the Executive Employment Agreement, it is possible that the claim against CenTrust Mortgage may be viable. As Defendant has cited no authority sufficient to establish as a matter of state law that CenTrust Bank was not and could not be CenTrust Mortgage's agent, we must take Plaintiff's allegation as true, and Defendant's motion to dismiss count I must be DENIED.

*b. Count III: Breach of Contract Against RTC*

■ Plaintiff alleges in Count III that by terminating Bender the RTC breached the employment agreement. Count III alleges that:

> 27. As an alternative claim, upon repudiation of the Employment Agreement by the RTC on February 5, 1990, the RTC was required to pay Bender the actual direct compensatory damages sustained by him, including but not limited to all salaries, termination pay, bonuses and vested interests in 401–K and pension plans.

> 28. The failure of the RTC to pay these amounts constituted a breach of the Employment Agreement....

First Amended Complaint at ¶¶ 27–28. The repudiation of a contract by the RTC is governed by an extensive array of statutory and regulatory provisions. 12 U.S.C. § 1821(e)[1] provides as follows:

**(e) Provisions relating to contracts entered into before appointment of conservator or receiver**

**(1) Authority to repudiate contracts**

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiv-

---

1. The statutory sections by their terms apply to the Federal Deposit Insurance Corporation. 12 U.S.C. § 1441a(b)(4) provides that the RTC enjoys the same powers and rights as provided the FDIC in 12 U.S.C. §§ 1821–1823. *See Rosa v. Resolution Trust Corp.,* 938 F.2d 383, 391 n. 10 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991).

er's discretion, will promote the orderly administration of the institution's affairs.

. . . .

**(3) Claims for damages for repudiation**

**(A) In General**

Except as otherwise provided . . . the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—

(i) limited to actual direct compensatory damages. . . .

**(B) No liability for other damages**

For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include—

(i) punitive or exemplary damages

(ii) damages for lost profits or opportunity

(iii) damages for pain and suffering.

The statute further provides a section applicable to claims for personal services. *See* 12 U.S.C.A. § 1821(e)(7) (West 1989). Section 1821(e)(7) provides that claims for services performed prior to the appointment of the RTC are to be paid in accordance with sections 1821(d) and 1821(i).[2]

Section 1821(d) provides for the general powers of the RTC. *See* 12 U.S.C.A. § 1821(d) (West 1989 & Supp.1992). Section 1821(d)(3) authorizes the RTC generally, as receiver, to determine claims. Section 1821(d)(4) authorizes the corporation to "prescribe regulations regarding the allowance or disallowance of claims by the receiver and providing for administrative determination of claims and review of such determination." 12 U.S.C.A. § 1821(d)(4) (West 1989 & Supp.

2. 12 U.S.C. § 1821(e)(7) provides as follows:
 **(7) Provisions applicable to service contracts**
 **(A) Services performed before appointment**
 In the case of any contract for services between any person and any insured depository institution for which the Corporation has been appointed conservator or receiver, any claim of such person for services performed before the appointment of the conservator or the receiver shall be—
 (i) a claim to be paid in accordance with subsections (d) and (i) of this section. . . .
 **(B) Services performed after appointment and prior to repudiation**

1992). Section 1821(d)(5) establishes procedures for the determination of claims. *See* 12 U.S.C.A. § 1821(d)(5) (West 1989 & Supp. 1992). Section 1821(d)(5)(D) expressly provides that the "receiver may disallow any portion of any claim . . . which is not proved to the satisfaction of the receiver," and section 1821(d)(5)(E) provides that there can be no judicial review of the receiver's determination under 1821(d)(1)(D) to disallow a claim. *See* 12 U.S.C.A. § 1821(d)(5)(D) (West Supp.1992); 12 U.S.C.A. § 1821(d)(5)(E) (West 1989). Section 1821(i) provides for the method to value claims against the RTC when the insured depository institution is in or in danger of default. *See* 12 U.S.C.A. § 1821(i) (West 1989 & Supp.1992).

Though it is undoubtedly true that the statutory sections discussed above, and the regulations promulgated thereunder, grant broad powers to the RTC to repudiate, dismissal at this juncture is inappropriate. Plaintiff has made out a claim for breach of contract, alleging, *inter alia*, that the RTC as successor to CenTrust Bank, has refused to pay pursuant to the contract. The RTC, in turn, has offered no analysis showing why the RTC's repudiation of Bender's contract necessarily precludes a state law breach of contract suit. Accordingly, Defendant's motion to dismiss Count II must be and is now DENIED.

*IV. Count II*

█ Count II contains a breach of contract claim against CenTrust Mortgage based upon a third party beneficiary theory. The Complaint alleges as follows:

If in the case of any contract for services described in subparagraph (A), the conservator or receiver accepts performance by the other person before the conservator or receiver makes any determination to exercise the right of repudiation under this section—
(i) the other party shall be paid under the terms of the contract for the services performed;
(ii) the amount of such payment shall be treated as administrative expense of the conservatorship or receivership.

23. Bender is informed, believes, and thereon alleges that Mortgage Company did enter into an agreement with Bank pursuant to Section 9.5 of the Employment Agreement, under which Mortgage Company agreed to pay directly to Bender all sums due Bender under the Employment Agreement for services rendered to Mortgage Company. Bender is a third party beneficiary of said agreement, and therefore is entitled to enforce it against Mortgage Company.

First Amended Complaint at ¶ 23. Defendant raises a variety of arguments for dismissal. However, reading the complaint in the light most favorable to Plaintiff, the Count has sufficiently alleged the existence of a contract as to which he is a third party beneficiary. Though the statute of frauds or other legal principles may bar Plaintiff's claim, dismissal at this stage is inappropriate.

■ It is unreasonable, however, to require Defendant to respond to the Count IV as it now reads. Accordingly, Defendant's motion for more definite statement is GRANTED. Plaintiff shall have 10 days from the date of this Order to amend this Count. The amended complaint shall specify with sufficient detail to enable a response the terms of the contract allegedly breached and the facts giving rise to the alleged breach. To the extent that Plaintiff is uncertain of any of these aspects, the amended count shall plead those facts giving rise to Plaintiff's allegation that Bender "is informed, [and] believes" that such contract exists.

### V. Count IV

■ Count IV raises a quantum meruit claim against CenTrust Mortgage, asserting that Bender performed services for that corporation without receiving compensation. We observe that the CenTrust Mortgage's motion does not address why a quantum meruit claim cannot be maintained. Given the Defendant's focus upon *D'Oench* and the related statutes, it may be that the RTC believes that *D'Oench* somehow bars a quantum meruit claim. It may also be the RTC's position that the comprehensive scheme established for repudiation precludes an attack in a state law based upon that repudiation.

At all events, Defendant's motion to dismiss Count IV must be and is now DENIED.

### VI. Count V

Count V of the First Amended Complaint raises a quantum meruit claim against the RTC, based upon services provided CenTrust Mortgage for the benefit of CenTrust Bank. For the reasons given in the Court's discussion of Count IV, the RTC's motion to dismiss Count V must be and is now DENIED.

### VII. Count VI

■ Count VI of the First Amended Complaint attempts to make out a claim for recovery against CenTrust Mortgage based upon an estoppel theory. "Where a party acts in such a way as to lead others reasonably to change position on the assumption that the party has adopted another's contract as his own, the party so acting is estopped to disclaim his apparent position as a party to the contract." *Sharp v. Adalia Bayfront Condominium, Ltd.*, 547 So.2d 674 (Fla. 2d DCA 1989) (quoting *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So.2d 744, 748 (Fla. 4th DCA 1971)). In the instant case, Bender alleges that because CenTrust Mortgage was paying his salary, he reasonably assumed that the subsidiary had assumed CenTrust Bank's obligation, and relied upon that assumption to his detriment. *See* First Amended Complaint at ¶¶ 32–33. For the purposes of a motion to dismiss, we must conclude that Plaintiff has made out a claim under state law for estoppel.

As with Counts I through V, Defendants have failed to show specifically why a valid state law cause of action, though arising out of a repudiation authorized by the federal statute, cannot be allowed to proceed. Accordingly, CenTrust Mortgage's motion to dismiss Count VI is now DENIED.

### VIII. Count VII

■ Count VII contains a breach of fiduciary duty claim by which Plaintiff alleges that by virtue of setting aside funds for Bender, CenTrust Mortgage undertook a fiduciary obligation to pay Bender. Once again, Defendant has provided no authority

suggesting that Plaintiff substantively can raise no breach of fiduciary duty claim, or that procedurally this claim is not properly raised. *See AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, 515 So.2d 180 (Fla.1987); *Interstate Securities Corp. v. Hayes Corp.*, 920 F.2d 769 (11th Cir.1991). In addition, CenTrust Mortgage has not established that by virtue of the scheme adopted by Congress for the repudiation of employment contracts, Plaintiff is precluded from bringing this claim. Accordingly, CenTrust Mortgage's motion to dismiss Count VII is now DENIED.

## IX. Count VIII

■ In Count VIII Plaintiff seeks to reform the employment contract to reflect the true intent of the parties, namely that it was CenTrust Mortgage that was primarily obligated to pay Bender's salary. "A written instrument may be reformed where it fails to express the intention of the parties as a result of mutual mistake, or unilateral mistake accompanied by inequitable conduct by the other party." *Department of Transportation v. Ronlee*, 518 So.2d 1326, 1328 (Fla.3d DCA 1988), *review denied*, 528 So.2d 1183 (Fla.1988) (citing *Camichos v. Diana Stores Corp.*, 157 Fla. 349, 25 So.2d 864 (1946)). Reading the complaint in the light most favorable to Plaintiff—as we are required to do at this stage in the proceedings—it alleges mutual mistake, and thereby sufficiently makes out a claim for reformation. The RTC has not demonstrated why a repudiated contract cannot be reformed. Nor has the agency shown why a state law reformation action is necessarily barred by virtue of the federal statutory and regulatory scheme governing repudiation. Accordingly, Defendant's motion to dismiss Count VIII is now DENIED.

## X. Count X[3]

■ Count X alleges tortious interference by various John Does with Bender's employment relationship. CenTrust Mortgage and the RTC have moved for a more

---

**3.** The RTC conceded that Plaintiff may maintain his claim for wrongful repudiation in Count IX. *See Jenkins–Petre Partnership One v. Resolution*

definite statement, but it is clear that this count does not seek to impose liability upon them. Accordingly, Defendants motion to dismiss or for more definite statement is DENIED.

## XI. Count XI

■ In Count XI Plaintiff seeks to impose a constructive trust upon the assets of CenTrust Mortgage, and specifically seeks to prevent the dissipation of CenTrust Mortgage. The RTC avowedly intends to liquidate CenTrust Mortgage and utilize the proceeds. First Amended Complaint at ¶¶ 45–46. Section 1821(j) of Title 12 provides as follows:

> Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.

12 U.S.C.A. § 1821(j) (West 1989). The RTC has broad statutory authority as receiver to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution...." 12 U.S.C.A. § 1821(d)(2)(E) (West 1989). *See Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 705–06 (1st Cir.1992) (discussing powers of FDIC); *Rosa v. Resolution Trust Corp.*, 938 F.2d 383, 397–98 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991) (discussing the wide range of powers or functions of the RTC as a conservator or receiver). As the district court wrote in *Gosnell v. Federal Deposit Ins. Corp.*:

> From a reading of [various statutory provisions], along with § 1821(j) it is evident that FIRREA empowers FDIC to sell a failed institution's assets, whatever they may be, free from interference by the Courts.
>
> From the language of § 1821(d)(2)(I), it is evident that Congress intended to vest FDIC with broad discretion in its conduct as receiver. The court is aware of no limitation or prescription concerning the

*Trust Corp.*, 1991 WL 160317, at *5 1991 U.S. Dist. LEXIS 20240, at *13 (D.Col. Aug. 13, 1991).

manner in which the FDIC disposes of acquired assets; rather the sections quoted above, when examined along with § 1821(j), provide the FDIC with the authority to dispose of assets free from judicial interference.

Lest any doubt remain, examination of FIRREA's legislative history compels the same conclusion. Congress wrote that the authorities granted to the FDIC were "designed to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." H.R.Rep. No. 101–54(I), 101st Congress, 1st Sess., 330, *reprinted in* 1989 U.S.Code Cong. & Admin.News 86, 126.....

No. 90–1266L, 1991 WL 533637, at \*5 1991 U.S.Dist. Lexis 16054, at \*13–14 (W.D.N.Y. Feb. 4, 1991); *see Telematics Int'l,* 967 F.2d at 707. Clearly, the assets of CenTrust Mortgage, the wholly owned subsidiary of CenTrust Bank, are assets of CenTrust Bank; Plaintiff does not dispute the power of the RTC to liquidate CenTrust Mortgage. *See* Plaintiff's Opposition to Resolution Trust Corporation's Motion to Dismiss [etc.] at 17–19; Supplemental Brief in Opposition to Resolution Trust Corporation's Reply Brief [etc.] [hereinafter "Plaintiff's Supplemental Reply to RTC"] at 2–9. Rather, Plaintiff argues that on the merits he will succeed, and that liquidation of CenTrust Mortgage, absent imposition of a constructive trust restricting the disposition of assets, will impede Plaintiff's ability to recover if he prevails.

Plaintiff contends that the RTC's repudiation of Bender's contract was beyond the scope of the RTC's authority. *See* Plaintiff's Supplemental Reply to RTC at 2–4. Plaintiff cites two cases for the well-established principle that courts may interfere with RTC activities where the RTC's actions fall outside the scope of its statutory authority. *See* Plaintiff's Supplemental Reply to RTC at 2–3. The first, *Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), decided before FIRREA, but based upon a provision similar to

§ 1821(j),[4] contained in the Federal Deposit Insurance Act, held that the provision "simply prohibits courts from restraining or affecting FSLIC's exercise of those receivership 'powers and functions' that have been granted by statutory sources." *Coit,* 489 U.S. at 574, 109 S.Ct. at 1369. In *Coit* the Supreme Court considered whether Congress granted the FSLIC, as receiver, the exclusive authority to adjudicate state law claims asserted against a failed savings and loan. *Id.* The Court held that Congress had not done so, and that creditors of the failed institution were entitled to *de novo* examination of their claims in court. The Court found that such adjudication would not "restrain or affect" the exercise of FSLIC's receivership function, and held that that statutory language only prevents interference with those FSLIC powers or functions that are granted elsewhere in the statute. *See Central W. Rental Co. v. Horizon Leasing,* 740 F.Supp. 1109, 1111–14 (E.D.Pa.1990); *Gosnell,* 1991 WL 533637, at \*3–5, 1991 U.S.Dist. Lexis 18054, at \*6–9.

The second case relied upon by Plaintiff is *281–300 Joint Venture v. Onion,* 938 F.2d 35 (5th Cir.1991), which interpreted and applied *Coit.* Pursuant to a loan agreement, San Antonio Savings Association (SASA) had agreed to advance money for the benefit of the plaintiff Joint Venture for the development of a certain piece of real property, and Joint Venture, in turn, was obligated to make various payments to SASA. The loan agreement further provided that in the event Joint Venture failed to make the required payments, SASA could foreclose on the land. Subsequently, the Federal Home Loan Bank Board (FHLBB) determined SASA was insolvent and appointed the FSLIC as conservator and later as receiver of the thrift. Later, the FHLBB created new SASA and appointed FSLIC conservator, responsible for liquidating SASA's assets by transferring them to new SASA. With the passage of FIRREA the FSLIC was abolished and the

---

**4.** *Coit* interpreted former section 1446(d)(6)(C), which stated that "[e]xcept as otherwise provided in this subsection, no court may take any ... action for or toward the removal of any ... receiver, or, except at the instance of the Board, restrain or affect the exercise of powers or functions of a receiver." *Coit,* 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). This provision, somewhat modified, is now codified at 12 U.S.C.A. § 1464(d)(2)(G) (West Supp.1992).

RTC succeeded the FSLIC as conservator. *281–300 Joint Venture,* 938 F.2d at 37.

Plaintiff is correct in citing *281–300 Joint Venture* for the general proposition that a court is not disabled by § 1821(j) when the relief sought from the court prevents the RTC from exceeding its power. However, the analysis presented by the Fifth Circuit shows that the RTC may not be impeded in the lawful exercise of its powers, even if in the underlying suit on the merits the RTC is in error. The Fifth Circuit wrote as follows:

> In *Coit* the Court stated that a court may not grant injunctive relief unless the power or function whose exercise is sought to be enjoined is beyond the powers granted to the RTC by statute. [*Coit,* 489 U.S.] at 574 [109 S.Ct. at 1369]. The function under consideration here is the ability of the conservator to foreclose on the property of a debtor, a power that Congress gave to the RTC under FIRREA. Indeed, when the RTC acts as a conservator or receiver, it has broad authority to dispose of assets and to "collect all obligations and money due the [failed] institution." 12 U.S.C. § 1821(d)(2)(B)(ii). Hence, the court may not enjoin the exercise of the RTC's powers in this instance, *see Shoreline Group, Ltd. v. Commonwealth Fed. Sav. & Loan Ass'n,* No. 90–6703–CIV, 1991 WL 496658 (S.D.Fla. Feb. 14, 1991), regardless of Joint Venture's likelihood of success on the underlying claims.

*281–300 Joint Venture,* 938 F.2d at 39. *See also Gross v. Resolution Trust Corp.,* No. 92–0826, 1992 WL 55741, at *2–3 1992 U.S.Dist. LEXIS 3041, at *6–10 (E.D.Pa. Mar. 13, 1992) (analysis determines whether RTC action to be interfered with is authorized by statute).

 In the instant case Plaintiff seeks to cordon off a pool of CenTrust Mortgage's assets for himself, should he ultimately prevail, with the creation of a constructive trust. Plaintiff has not disputed that the RTC is empowered to liquidate CenTrust Mortgage and disburse the proceeds; rather, Plaintiff has argued that on the merits, the RTC's repudiation of the contract was invalid, and that a constructive trust should be imposed to preserve his remedy. Applying the analysis in *281–300 Joint Venture,* we believe it is clear that when a plaintiff seeks to interfere with a RTC activity, and thereby avoid the bar imposed by § 1821(j), it is the RTC action with which Plaintiff seeks to interfere that must exceed the powers of the RTC. As there is no dispute that the RTC has the clear authority to liquidate CenTrust Mortgage, just as it was clear in *281–300 Joint Venture* that the RTC possessed the authority to foreclose upon the land in question, the ultimate merits of Plaintiff's complaint against the RTC are irrelevant. Thus, even if the Court had the power to enjoin the RTC from repudiating Bender's contract, on the grounds that the act was somehow *ultra vires,* we do not have the power to interfere with the proper disposition of CenTrust Mortgage assets.

 In the instant case, moreover, it is clear that the RTC did not exceed its authority in the underlying dispute. Plaintiff notes that section 1821(e)(1) provides that the receiver for any "insured depositary institution may disaffirm or repudiate any contract or lease … to which such institution is a party," 12 U.S.C.A. § 1821(e)(1) (West 1989), and argues that because the definition of "insured depositary institution" contained in section 1813(c)(2) [5] does not include non-insured subsidiaries such as CenTrust Mortgage, the RTC lacked the power to repudiate the contract.

It is clear however that the insured depositary institution, CenTrust Bank, was a party to the employment contract, and thus this contract falls within the express language of § 1821(e)(1). The contract's preamble specifies that it is an "EMPLOYMENT AGREEMENT made June 10, 1985 between CENTRUST SAVINGS BANK … and George R. Bender." David L. Paul signed the contract in his capacity as Chairman of the Board and Chief Executive Officer of CenTrust Savings Bank. And, finally, the contract imposes various duties upon CenTrust

---

**5.** Section 1813(c)(2) provides as follows: "The term 'insured depository institution' means any bank or savings association the deposits of which are insured by the Corporation pursuant to this chapter." 12 U.S.C.A. § 1813(c)(2) (West 1989).

Bank. *See* Executive Employment Agreement, First Amended Complaint, Exhibit. Indeed, in support of his claim that CenTrust Mortgage is also bound by the employment agreement, in the general factual allegations section of the complaint Plaintiff alleges that it was the intent that the Bank be bound by the employment agreement, albeit jointly and severally with the CenTrust Mortgage. *See* First Amended Complaint at ¶ 9.

Moreover, even if CenTrust Bank were not a party to the employment agreement—and it clearly is—we would be hard pressed to find that the RTC cannot repudiate a contract entered into by a wholly-owned subsidiary of a failed insured depository institution. We observe that the provisions of 1823(e), discussed at length above, also apply to "insured depository institutions," and that the Eleventh Circuit concluded in *Victor Hotel* that 1823(e) applies to wholly owned subsidiaries. *Victor Hotel*, 928 F.2d at 1083. In that case the Court held that to exclude subsidiaries from *D'Oench* and § 1823(e) would seriously undermine the policy behind the doctrine, namely allowing the FSLIC to evaluate quickly a financial institution's condition from a review of its files. *Id.* Similarly, prohibiting the RTC from repudiating an onerous contract entered into by a wholly owned subsidiary would defeat the RTC's ability to avoid burdensome obligations and impair its attempts to maximize the assets of the institution.

Finally, we note that in addition to arguing that the RTC did not have the power to terminate Bender's contract because he was employed by a subsidiary, Plaintiff has also argued and alleged that the repudiation constituted an abuse of discretion. *See* First Amended Complaint at ¶ 41. The RTC has conceded that an action alleging improper

repudiation may be brought in this Court. Even if it is shown that such repudiation was improper, however, we do not believe that an improvident decision is the type of abuse of power that the Supreme Court had in mind in *Coit.*[6]

We observe, in addition, that in *Rosa v. Resolution Trust Corp.* the Third Circuit ruled that despite the allegation that the RTC's termination of an ERISA plan was illegal, and was therefore beyond the powers of the RTC, the Court found "no such limitation in the language of § 1821(j).... [to do so] would undermine the purpose of the statute, namely to permit the RTC as conservator or receiver to function without judicial interference...." 938 F.2d 383, 397 (3d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991).[7] We believe it is clear from the relevant law, the First Amended Complaint, and the pleadings relevant to this motion, that the RTC did not exceed its authority—though, of course, the Court expresses no opinion as to whether the RTC abused its discretion. Accordingly, we hold that 12 U.S.C. § 1821(j) renders the court without the power to impose a constructive trust and prevent the dissipation of CenTrust Mortgage's assets. Accordingly, Count XI of Plaintiff's Complaint must be and is DISMISSED.

In summary, Defendants' motions to dismiss are DENIED as to Counts I, II, III, IV, V, VI, VII, VIII, IX, and X, and GRANTED as to Count XI. Defendants' motions for more definite statement are DENIED as to Counts I, III, IV, V, VI, VII, VIII, IX, X, and XI, and GRANTED as to Count II.

Plaintiff is directed to submit a Second Amended Complaint containing an amended

---

**6.** We observe that the Ninth Circuit, in ruling that the court has jurisdiction to decide whether the FSLIC conformed to state foreclosure law, made clear that "we do not mean to establish the overly simple proposition that every time a party claims that a receiver has done an act in an improper manner adjudication can have no effect upon the exercise of powers of the receiver. That would be an overly broad exception, which would enable any clever pleader to swallow up the statute at will." *Abbott Building Corp. v. United States*, 951 F.2d 191, 195 (9th Cir.1991) (decided under 12 U.S.C. § 1446(d)(6)(C), the

section that is parallel to section 1821(j) and was at issue in *Coit*).

**7.** The RTC has argued in addition that sections 1821(e)(3)(A)–(B), which limit the liability of the RTC to actual compensatory damages, bar the imposition of a constructive trust. Though it may be true that this section would limit the size of such trust to compensatory damages, the statutory language clearly limits the amount of liability, and is silent as to whether the amount of liability should be segregated or held in trust.

Count II within ten (10) days of the date of this Order.

DONE AND ORDERED.