907 F.2d 1101
 59 USLW 2226
 Alan P. VERNON, Ted H. Vernon and Melinda B. Vernon, as
personal representatives of Estate of Harold
Vernon and Emily Vernon, Plaintiffs-Appellants,
v.
RESOLUTION TRUST CORPORATION, As Receiver for Freedom
Savings and Loan Association, Defendants-Appellees,
Robert M. Klingler, et al., Defendants.
 No. 89-5185.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 3, 1990.
 
 Ira C. Hatch, Jr., Houston, Shahady & Hatch, Ft. Lauderdale, Fla., for plaintiffs-appellants.
 John R. Stump, Alfred I. Frith, Philip D. Storey, Frith & Stump, Orlando, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before FAY, Circuit Judge, RONEY*, Senior Circuit Judge, and PITTMAN**, Senior District Judge.
 FAY, Circuit Judge.
 
 
 1
 Appellants are the disappointed shareholders of a defunct savings and loan association (Old Freedom) declared insolvent barely a year and a half after appellants' predecessor in interest bought several million dollars of its shares. Appellants brought suit against several parties including appellee Freedom Savings and Loan Association (New Freedom),[1] the institution that purchased the bulk of Old Freedom's assets and liabilities from the Federal Savings and Loan Insurance Corporation (FSLIC) which acted as receiver for Old Freedom upon its insolvency. Appellants allege that the purchase of Old Freedom's shares had been induced by fraud and misrepresentation on the part of Old Freedom's officers, legal counsel, and investment bankers regarding Old Freedom's financial condition, and that the actions of these persons constituted violations of federal and Florida securities and RICO laws and common law fraud. Although New Freedom did not participate in any of the alleged wrongdoing, appellants assert that one of the liabilities assumed by New Freedom was appellants' claim against Old Freedom. The district court granted New Freedom's motion for summary judgment against appellants, holding that the Supreme Court decision of D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its progeny barred appellants from bringing their suit against New Freedom. We AFFIRM the judgment of the district court, albeit on different grounds.
 
 I. BACKGROUND
 
 2
 On February 24, 1986, Old Freedom sold to a group of investors approximately $14,000,000 of its series A-1 preferred stock and warrants to purchase Old Freedom common stock. As one of those investors, Harold Vernon acquired 26,530 shares of preferred stock and warrants to obtain an additional 39,795 shares of common stock for a total consideration of $2,653,000. Vernon also set up an individual retirement account (IRA) with Old Freedom and through the IRA bought 9,470 shares of Old Freedom series A-1 preferred stock and warrants to purchase 14,205 shares of Old Freedom common stock for a total of $947,000.
 
 
 3
 Old Freedom was declared insolvent on July 23, 1987, and the FSLIC was appointed as receiver of Old Freedom. On that same date, the FSLIC entered into an acquisition agreement with New Freedom, a federal savings and loan association created to acquire substantially all of Old Freedom's assets from the FSLIC and which also assumed most of Old Freedom's liabilities. The agreement between the FSLIC and New Freedom excludes certain claims and liabilities from the assets and liabilities acquired, however. Specifically, the acquisition agreement provides that
 
 
 4
 The ACQUIRING ASSOCIATION hereby expressly assumes and agrees to pay, perform, and discharge all of the CLOSED ASSOCIATION's liabilities, including, but not limited to, those shown on the CLOSED ASSOCIATION's books and records at such time as the RECEIVER takes possession of the CLOSED ASSOCIATION, but excluding, however, obligations under any compensation or employment contract between the CLOSED ASSOCIATION and any of its employees, officers, or directors, other than obligations to honor or satisfy any rights already vested under such contracts. The term "liability" as used in this section does not refer to any obligation of the CLOSED ASSOCIATION to its stockholders for or in connection with their stock holdings, or any obligation to indemnify controlling persons, directors, officers or other persons as a result of suits arising from claims described in Sec. 1(a), and the ACQUIRING ASSOCIATION specifically does not assume by virtue of this Agreement any such obligations to the stockholders or for indemnification of the directors, officers or employees of the CLOSED ASSOCIATION....
 
 
 5
 R1-34, Exh. B at 4-5 (Acquisition Agreement Sec. 2).
 
 
 6
 Appellants, the personal representatives of Vernon's estate and Vernon's widow, brought suit against Old Freedom, the FSLIC, Old Freedom's primary investment banker, Old Freedom's legal counsel, one former director of Old Freedom, and New Freedom. Appellants aver that Old Freedom and the other defendants failed to disclose Old Freedom's true financial condition in the February 24, 1986 transactions as well as in a series of other securities transactions designed to raise additional capital required by regulatory authorities. Appellants further allege that Old Freedom was insolvent at the time of the 1986 transactions and that the securities sold were worthless. Appellants claim violations of Florida and federal securities laws, federal and state RICO acts, and causes of action for common law fraud and misrepresentation. Appellants assert that the FSLIC, as receiver for Old Freedom, became liable for any claims that could have been asserted against Old Freedom and that this liability transferred to New Freedom as the successor in interest to the FSLIC through the Acquisition Agreement.
 
 
 7
 New Freedom moved the district court for summary judgment, arguing that, based on the legal principles set forth in D'Oench, Duhme & Co., 315 U.S. 447, 62 S.Ct. 676, the FSLIC, as receiver for Old Freedom, did not assume or acquire any of the liabilities of Old Freedom alleged in appellants' complaint. Since New Freedom could acquire from the FSLIC only that which the FSLIC possessed, New Freedom maintained that it too did not assume or acquire the liabilities asserted by appellants. Appellants opposed New Freedom's motion, contending that the D'Oench doctrine did not apply to bar their claims against the FSLIC, and thus could not bar derivatively their claims against New Freedom. The trial court determined that the D'Oench doctrine did act to bar appellants' claims against New Freedom and granted summary judgment in favor of New Freedom. Pursuant to Federal Rule of Civil Procedure 54(b), the court entered its final judgment in favor of New Freedom on February 6, 1989, from which judgment appellants appeal.
 
 II. STANDARD OF REVIEW
 
 8
 A grant of summary judgment is subject to de novo review by this court. Carriers Container Council, Inc. v. Mobile S.S. Assoc., 896 F.2d 1330, 1337, modified, 904 F.2d 28 (11th Cir.1990). The parties have simplified this task for us in that neither side disputes the facts recited by the other, and none of the facts conflict. We need only address whether New Freedom is entitled as a matter of law to the summary judgment issued by the district court. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 250, 106 S.Ct. 2505, 2509-10, 2511, 91 L.Ed.2d 202 (1986).
 
 III. DISCUSSION
 A. The D'Oench Doctrine
 
 9
 The D'Oench doctrine arose from a situation in which a bank obtained a promissory note to prevent the bank's books from reflecting a loss from another debtor which had defaulted; however, an understanding existed between the bank and the notemaker that the bank would not enforce the note and that the interest paid would be remitted to the notemaker. The bank later failed. The Federal Deposit Insurance Corporation (FDIC), as the bank's insurer, attempted to collect on the note. The notemaker contended that he owed nothing to the bank, pursuant to his arrangement with the bank. The Supreme Court concluded, however, that there exists "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." D'Oench, 315 U.S. at 457, 62 S.Ct. at 679. Even though the notemaker had no intention of deceiving any authorities and no harm was actually done, the Court refused to allow the notemaker to escape his liability on the basis of the secret arrangement between himself and the bank, because that arrangement violated public policy. Id. at 458-59, 62 S.Ct. at 679-80.
 
 
 10
 The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.
 
 
 11
 Id. at 460, 62 S.Ct. at 681.
 
 
 12
 The purpose of the federal policy articulated by the Supreme Court in D'Oench isto allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when ... the FDIC is deciding whether to liquidate a failed bank or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank. The last kind of evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.
 
 
 13
 Langley v. Federal Deposit Ins. Corp., 484 U.S. 86, 91-92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (quoting Gunter v. Hutcheson, 674 F.2d 862, 865 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)) (citations omitted).
 
 
 14
 Initially, the D'Oench doctrine was applied only to cases which closely paralleled the facts in D'Oench: a debtor trying to avoid liability to the FDIC on a debt instrument from an insolvent bank by claiming an unrecorded side agreement that discharges any obligation to pay the debt. Subsequently, the doctrine was partially codified at 12 U.S.C. section 1823(e) which provided that
 
 
 15
 No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.
 
 
 16
 12 U.S.C. Sec. 1823(e) (1988). As originally enacted, section 1823(e) pertained only to the FDIC acting in its corporate capacity when it purchased bank assets from its receivership division.[2] Nonetheless, courts have referred to section 1823(e) and the cases interpreting it as guidelines for the application of the D'Oench doctrine. See, e.g., Federal Deposit Ins. Corp. v. Newhart, 892 F.2d 47, 50 (8th Cir.1989); Federal Sav. & Loan Ins. Corp. v. LaFayette Inv. Properties, Inc., 855 F.2d 196, 198 & n. 1 (5th Cir.1988); Federal Sav. & Loan Ins. Corp. v. LeFeve, 676 F.Supp. 764, 768 (S.D.Miss.1987); Federal Sav. & Loan Ins. Corp. v. Hsi, 657 F.Supp. 1333, 1338 (E.D.La.1986). Under section 1823(e), the courts have protected the FDIC from secret non-payment agreements, assertions of unwritten arrangements allegedly breached by the bank rendering the debt voidable, and--perhaps most significantly--claims that the creation of the debt was fraudulently induced by the bank. See, e.g., Langley, 484 U.S. at 93, 108 S.Ct. at 402 (fraud in the inducement no defense to Sec. 1823(e)); Chatham Ventures, Inc. v. Federal Deposit Ins. Corp., 651 F.2d 355 (5th Cir. Unit B July 1981) (defense that loan part of breached, unwritten, larger joint venture agreement fails under Sec. 1823(e)), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982); Federal Deposit Ins. Corp. v. Hoover-Morris Enters., 642 F.2d 785, 787 (5th Cir. Unit B. Apr.1981) (unwritten, partially performed accord and satisfaction no defense).
 
 
 17
 A far more expansive protection of federal bank insurers developed in the federal common law following D'Oench. The D'Oench doctrine has been held to protect the FDIC as receiver, the FSLIC in its receiver and corporate capacities, and entities which obtain the assets of the failed bank through purchase and assumption agreements with either federal receiver. See, e.g., Bell & Murphy & Assocs. v. Interfirst Bank Gateway, N.A., 894 F.2d 750, 754-55 (5th Cir.1990) (claims barred as to FDIC also barred as to bridge banks that take over operations of failed bank); Newhart, 892 F.2d at 50 (protected status of FDIC on notes it holds transfers to subsequent purchaser of notes); Federal Sav. & Loan Ins. Corp. v. Two Rivers Assocs., 880 F.2d 1267, 1274, 1276-77 (11th Cir.1989) (D'Oench doctrine applicable to the FSLIC and FDIC in both receiver and corporate capacities). Further, under D'Oench courts have protected these entities not only from secret or misleading schemes and agreements, but have created for them a quasi-holder-in-due-course status, whereby if the insurer purchases a note in a good faith transaction without knowledge of any wrongdoing involving the note, the insurer and its successors have a complete defense against, inter alia, claims of state and common law fraud, violation of state or federal securities laws, and the affirmative defenses of waiver, estoppel, unjust enrichment, failure of consideration and usury. See, e.g., Gunter v. Hutcheson, 674 F.2d 862, 873 (11th Cir.) (court creates federal rule of holder in due course status for FDIC, barring state and common law fraud defenses), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); Newhart, 892 F.2d at 50-51 (FDIC and its transferees have holder in due course status); Firstsouth, F.A. v. Aqua Const., Inc., 858 F.2d 441, 443 (8th Cir.1988) (FSLIC has holder in due course status); Federal Sav. & Loan Ins. Corp. v. Murray, 853 F.2d 1251, 1256 (5th Cir.1988) (FDIC has holder in due course status); Federal Deposit Ins. Corp. v. Investors Assocs. X., Ltd., 775 F.2d 152, 155-156 (6th Cir.1985) (D'Oench used to bar claims of state and federal securities violations);[3] Federal Deposit Ins. Corp. v. Leach, 772 F.2d 1262, 1266, 1267 (6th Cir.1985) (federal common law bars failure of consideration and usury defenses); Federal Deposit Ins. Corp. v. Gulf Life Ins. Co., 737 F.2d 1513, 1517 (11th Cir.1984) (federal common law protects FDIC from claims of estoppel, waiver, unjust enrichment). At least one court has even utilized the rationale underlying D'Oench to bar a RICO claim against the FDIC in its capacity as receiver for an insolvent bank. See First City Nat'l Bank & Trust Co. v. Federal Deposit Ins. Corp., 730 F.Supp. 501, 511 (E.D.N.Y.1990).[4]
 
 
 18
 Thus the D'Oench doctrine has been used to protect entities that have acquired assets of failed banks from the FSLIC as receiver from exactly the claims which appellants in this case have brought against New Freedom: violations of the Securities and Exchange Act, RICO, and state securities and racketeering acts, as well as common law fraud and misrepresentation. The case we review today differs, however, in one important respect from all the cases cited above and indeed from all the D'Oench doctrine cases this court has examined. In every D'Oench doctrine case save one,[5] the FDIC, the FSLIC, or some successor in interest asserted or defended the validity and enforceability of a particular debt or monetary obligation owed to the failed bank, be it a promissory note, a mortgage, a letter of credit or personal guaranty or collateral pledge agreement securing a loan, rental payments under a lease, or a refund provision in an insurance contract. Appellants are not obligees trying to avoid their commitment on an asset which New Freedom acquired via a purchase and assumption agreement. The Acquisition Agreement between appellants and Old Freedom was fully executed. Appellants have their stocks and warrants, in exchange for which Old Freedom received $3.6 million, assets presumably now possessed by New Freedom. Appellants wish to obtain compensation from the general assets of New Freedom, which they assert has succeeded to the liabilities of Old Freedom, for the damages they claim to have suffered as stockholders due to the alleged tortious acts of Old Freedom. New Freedom would have us extend the D'Oench doctrine to preserve all assets, whether actually possessed or receivable, acquired by a federal insurer or its successor in interest from all claims tending to diminish those assets, save those claims clearly supported by the records of the insolvent bank.[6]
 
 
 19
 The expansion of the D'Oench doctrine suggested by New Freedom might well further the background goal of favoring and facilitating the purchase and assumption of insolvent banks over liquidation. We decline to adopt such a rule, however, as we believe it would be both inappropriate and unnecessary in this appeal.
 
 
 20
 When Old Freedom became insolvent and the FSLIC was appointed as receiver, the FSLIC took possession of both the assets and the liabilities of the failed bank. See, e.g., Federal Deposit Ins. Corp. v. Condit, 861 F.2d 853, 857 (5th Cir.1988); Federal Deposit Ins. Corp. v. R-C Mktg. & Leasing, Inc., 714 F.Supp. 1535, 1545 (D.Minn.1989). Had the FSLIC elected to liquidate Old Freedom, it would have had the "power to carry on the business of and to collect all obligations to" Old Freedom, see 12 U.S.C. Sec. 1729(d), and would have enjoyed the protection of D'Oench in collecting those obligations. However, the same liquidation statute imposes on the FSLIC the duty to "settle, compromise, or release claims in favor of or against [Old Freedom], and to do all other things that may be necessary in connection therewith," and to "pay all valid credit obligations of [Old Freedom]." 12 U.S.C. Sec. 1729(b)(1)(B), (d). The Supreme Court in Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp., 489 U.S. 561, ----, 109 S.Ct. 1361, 1369, 103 L.Ed.2d 602 (1989), explained that these provisions empower the FSLIC to pay claims that are proved to the FSLIC's satisfaction and that claimants may bring suit to have a court determine the validity of their claims. Certain claims, such as tort claims, might not appear in the books of a failed bank and yet easily be shown to be valid. The rule proposed by New Freedom would bar such claims from being successfully asserted when Congress has provided that such claims be paid. New Freedom's rule cannot prevail.[7]
 
 B. The Acquisition Agreement
 
 21
 Rather than liquidate Old Freedom, the FSLIC elected to effect a purchase and assumption agreement with New Freedom. Since the FSLIC inherited Old Freedom's liabilities, recorded and unrecorded, to legitimate claimants, these liabilities could have been passed on to New Freedom through the Acquisition Agreement. In fact, in section two of the Acquisition Agreement, New Freedom stated that it expressly assumed and agreed to "pay, perform, and discharge" all of Old Freedom's liabilities, including but not limited to the liabilities shown on Old Freedom's books and records at the time that the FSLIC took possession of Old Freedom, excluding any obligations under compensation or employment contracts between Old Freedom and its employees, officers or directors. R1-34, Exh. B at 4-5.[8] However, New Freedom excepted from its definition of "liability" "any obligation of [Old Freedom] to its stockholders for or in connection with their stock holdings," emphasizing that it did not "assume by virtue of this Agreement any such obligations to the stockholders." Id. at 5.
 
 
 22
 We cannot escape our conviction that section two of the Acquisition Agreement disposes of appellants' claims against New Freedom. Section 14 of the Acquisition Agreement provides that "[t]o the extent that federal law does not control, this Agreement and the rights and obligations under it shall be governed by the law of the State of Florida." Id. at 12. As there exists no federal law of construction of contracts, our interpretation of the language of the Agreement is therefore controlled by Florida law. Where the facts are undisputed, as in this case, the construction of a contract is a question of law. Smith v. State Farm Mut. Auto. Ins. Co., 231 So.2d 193, 194 (Fla.1970). "Under Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning." Quesada v. Director, Federal Emergency Mgmt. Agency, 577 F.Supp. 695, 697 (S.D.Fla.1983), aff'd, 753 F.2d 1011 (11th Cir.1985). While appellants have posited that section two of the Acquisition Agreement refers only to "those claims based upon or in connection with stock ownership rights" such as dividend and liquidation rights, R1-46-4, the plain language of the Agreement simply excludes any obligation of Old Freedom to its stockholders related to their stock holdings from the liabilities assumed by New Freedom. Clearly the suit from which this appeal arose constitutes an Old Freedom shareholder dispute with Old Freedom regarding stock holdings, exactly what the Agreement between New Freedom and the FSLIC expressly excepted from their transaction.
 
 
 23
 Interpreting the Agreement employing the ordinary meaning of the words used is also the most reasonable construction of section two. When a bank becomes insolvent, there are likely to be disgruntled shareholders who have lost much invested money and who may seek to recoup at least a portion of their loss from whatever assets remain. Undoubtedly very few, if any, banks would enter into purchase and assumption agreements with a federal receiver if the successor banks had to assume the latent claims of unknown magnitude of shareholders like appellants. Construing section two as barring any liability on New Freedom's part for stockholders' claims against Old Freedom regarding their stock seems to us to be the only agreement into which New Freedom would have entered. The interpretation submitted by appellants, by contrast, would be, as one court has termed it, " 'unusual, inequitable, and such as reasonable men would not likely enter into.' " Wilkin v. Citizens Nat'l Bank, 298 Ill.App. 38, 18 N.E.2d 251, 256 (1938) (quoting Ouska v. Pearson, 291 Ill.App. 6, 9 N.E.2d 69, 71 (1937)). We hold that as a matter of law, under the terms of the Acquisition Agreement between the FSLIC and New Freedom, New Freedom is free of any liability to Old Freedom stockholders for any claims related to their stock holdings. The district court therefore correctly entered summary judgment in favor of New Freedom.
 
 
 24
 This opinion, of course, does not address appellants' allegations against the other defendants named in appellants' complaint. Those claims remain pending in the district court.
 
 
 25
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Virgil Pittman, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation
 
 
 [1]
 On February 7, 1989, the FSLIC was appointed conservator for New Freedom. Since that time, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRRE Act), Pub.L. No. 101-73, 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183, the FSLIC has been abolished and the Resolution Trust Corporation (RTC) appointed as successor to those interests of the FSLIC to which the FSLIC was appointed as conservator or receiver on or after January 1, 1989. FIRRE Act, Pub.L. No. 101-73, Secs. 401(a)(1), (f)(2), 501(b)(3)(A), 1989 U.S.Code Cong. & Admin.News (103 Stat. 183) at 354, 356, 369. We granted the RTC's motion to substitute itself as appellee; therefore our affirmance of the district court's judgment in actuality redounds to the benefit of the RTC, the real party in interest, and not New Freedom, which no longer exists
 
 
 [2]
 Section 1823(e) has been amended under the FIRRE Act to apply to the FDIC acting in either its corporate or receiver capacity. That section now reads:
 No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement--
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.
 FIRRE Act, Pub.L. No. 101-73, Sec. 217(4), 1989 U.S.Code Cong. & Admin.News (103 Stat.) at 256.
 
 
 [3]
 But see Astrup v. Midwest Fed. Sav. Bank, 886 F.2d 1057, 1059 (8th Cir.1989) ("[T]he District Judge rightly held that it would be an extension of D'Oench Duhme to apply it to a tort claim.... That doctrine affords no protection against tort claims against a financial institution, whether for personal injuries to a motorist in a collision with an armored car bringing money to the S. & L. office, or for insider profits in a sale of securities violating Securities and Exchange regulations...." (emphasis added)); Gunter, 674 F.2d at 874 ("Although the district court held that a rule of federal common law protecting the FDIC from state and common law fraud claims also prohibited a rescission action for securities law violations, we decline to extend the rule so far. While adopting state law as to the fraud claims would frustrate the federal policies of promoting stability of and confidence in the banking system and thus must give way to a uniform federal rule, we are less confident that these federal policies behind the FDIC Act outweigh the strong policies of investor protection embodied in the [federal] securities laws." (footnote omitted))
 
 
 [4]
 In fact, after extensive research, this Court has unearthed only three types of situations where an assertion of D'Oench failed to bar the defense raised by the debtor to resist enforcement of the debt instrument: when the borrower is completely innocent of any intentional or negligent deception in her defense against her debt; when the defense is manifest on the face of the obligation the insurer seeks to enforce; and when the borrower is a nonnegligent victim of fraud in the factum. In Federal Deposit Ins. Corp. v. Meo, 505 F.2d 790 (9th Cir.1974), "[t]he question raised [on] appeal [was] whether a purchaser of bank stock, unaware that the stock order has been improperly executed, is estopped from avoiding his note to the bank for failure of consideration after the bank has collapsed and gone into receivership." Id. at 791. The court held that D'Oench cannot control in the case of a totally innocent party. "A bona fide borrower, like Meo, is not an insurer of financial representations of the bank with whom he conducts business. We conclude that a bank borrower who was neither a party to any deceptive scheme involving, nor negligent with respect to, circumstances giving rise to the claimed defense to his note is not estopped from asserting such defense against the bank's receiver." Id. at 793
 Howell v. Continental Credit Corp., 655 F.2d 743 (7th Cir.1981), concerned a woman who entered into a complicated purchase and lease agreement, which, fortunately for her, was detailed in her agreement with the bank. The bank breached its obligations under the agreement, so the woman ceased her payments to the bank's assignee, another bank, and eventually a lawsuit ensued. During the course of the suit, the assignee bank failed and the FDIC stepped in as receiver and attempted to enforce the lease agreement against the woman, arguing that she was estopped to defend on the basis of breach because of D'Oench and section 1823(e). The court disagreed. "We believe these holdings [D'Oench and its progeny] are inapplicable, therefore, where the document the FDIC seeks to enforce is one, such as the leases here, which facially manifests bilateral obligations and serves as the basis of the lessee's defense. In these situations, we do not believe the lessee should be held liable automatically simply because the FDIC has become a belated party to the transaction." 655 F.2d at 746-47.
 Finally, in Federal Deposit Ins. Corp. v. Turner, 869 F.2d 270 (6th Cir.1989), Turner signed an essentially complete guaranty form, with blanks left only for the name of the debtor and the amount of guaranty, for a friend who owned a bank. The friend whited out the name of the bank printed on the form, inserted the name of another bank, and filled in the name of another debtor in the blank provided. When Turner discovered what had occurred, he contacted the bank holding the guaranty and followed the bank's instructions on how to remove his guaranty, including sending a letter which was kept on file at the bank. When he asked for proof of the removal of his guaranty, the bank informed him that it had been removed from the files and destroyed. Subsequently, the bank failed, the FDIC stepped in, and sued to enforce the guaranty which had never been removed. The court found that this case involved fraud in the factum, in that the whiting out and alteration of the guaranty so fundamentally altered what Turner thought he had signed that it created a situation where Turner was unaware of the essential terms of the agreement. In addition, Turner was not negligent and did not act in a way likely to mislead federal authorities. Thus Turner's defense of fraud in the factum was not barred by D'Oench.
 
 
 [5]
 In Belsky v. First Nat'l Life Ins. Co., 653 F.Supp. 80 (D.Neb.1986), aff'd, 818 F.2d 661 (8th Cir.1987), the court applied section 1823(e) to block an ex-executive of a defunct bank from collecting the benefits of an insurance program pursuant to a salary continuance arrangement. The executive argued that under the terms of an agreement he had entered into with the bank, he had an interest in the life insurance policy. The court rejected this argument because the agreement the executive had with the bank was not "approved by the board of directors of the [bank] or its loan committee," 12 U.S.C. Sec. 1823(e)(3), and thus the insurance policy remained a clear asset of the bank. This result obtained from a simple application of the terms of the statute which does not, except most indirectly, relate to the case at hand
 
 
 [6]
 Naturally, the fraud, misrepresentation and other malfeasance alleged by appellants do not appear within the records of Old Freedom
 
 
 [7]
 Cf. Astrup, 886 F.2d at 1059 ("[T]he District Judge rightly held that it would be an extension of D'Oench Duhme to apply it to a tort claim.... That doctrine affords no protection against tort claims against a financial institution....")
 
 
 [8]
 In fact, New Freedom's assumption of Old Freedom's liabilities formed the basis of the transaction between the FSLIC and New Freedom. The Assumption Agreement was not some gimmick to transfer Old Freedom's assets to New Freedom at no cost to New Freedom. New Freedom was a bona fide purchaser for value. The Assumption Agreement provided that
 The purchase price of all assets sold to the ACQUIRING ASSOCIATION pursuant to Sec. 1 shall be (1) the assumption of liabilities provided for in Sec. 2, and (2) the positive net worth (if any) of the CLOSED ASSOCIATION as of the effective date of this Agreement. Such amount equal to such positive net worth shall be paid to the RECEIVER within fifteen (15) business days following the date on which the RECEIVER furnishes a copy of such audit to the ACQUIRING ASSOCIATION pursuant to Sec. 4.
 R1-34, Exh. B at 7.