FOX & LAZO–ATLANTIC
COMMERCIAL GROUP,
INC., Plaintiff,

v.

RESOLUTION TRUST CORPORATION
as Receiver for Security Savings Bank,
SLA, Delilah Land Corporation, and
Chancellor Land Corporation, Defendants.

Civ. No. 93–248(JBS).

United States District Court,
D. New Jersey.

March 30, 1994.

Joseph Patrick Murray, Brigantine, NJ, for plaintiff.

Paul A. Mainardi, Jeffery Ugoretz, Brown & Connery, Westmont, NJ, for defendant Resolution Trust Corp. as Receiver for Sec. Sav. Bank, SLA, Delilah Land Corp. and Chancellor Land Corp.

## OPINION

SIMANDLE, District Judge:

Presently before the court is the motion by defendants,[1] for summary judgment dismiss-

---

1. Resolution Trust Corporation, Receiver for Defendant Security Savings Bank, SLA [hereinafter "Defendant"], was substituted as the defendant in the state court proceeding prior to removal. Defendants Delilah Land Corporation and Chancellor Land Corporation are likewise subsidiaries of Security Savings Bank and are represented here by RTC's counsel. Former defendants John Millar and Avalon Commercial Corporation reached a settlement, and a stipulation of dismissal was entered on June 8, 1993 dismissing the claims against Millar and Avalon.

ing Counts One (contractual claim for commission against defendant-sellers) and Two (breach of implied or quasi-contract and unjust enrichment claim for commission against defendant-sellers) of plaintiff's complaint, pursuant to Fed.R.Civ.P. 56. Defendants' motion is made in connection with plaintiff's claims for payment of a real estate brokerage commission upon defendants' sale of real estate to former defendant John Millar. Defendants Delilah Land Corporation (Delilah) and Chancellor Land Corporation (Chancellor) are wholly owned subsidiary corporations of Security Savings Bank, SLA (Security). Security is a failed Savings & Loan Association, declared insolvent on December 4, 1992, by the Office of Thrift Supervision. Security is currently in receivership with the Resolution Trust Corporation (RTC), the present defendant.[2]

Plaintiff's case was originally filed in the Superior Court of New Jersey on October 4, 1990. On January 15, 1993, a Notice of Substitution was filed in the state court action by which RTC, as receiver for Security Savings Bank, SLA was, substituted as a party defendant for Security. On January 19, 1993, RTC as receiver removed this action from the Superior Court of New Jersey, Law Division, Atlantic County to this court pursuant to 28 U.S.C. § 1441(a). For the reasons stated herein, defendants' motion for summary judgment on Counts One and Two of the complaint is hereby granted.

### Background

The present case is one by plaintiff Fox & Lazo, Inc., Atlantic Commercial Group (Fox & Lazo) to recover a real estate brokerage commission on the sale of defendants' real property. The property, Delilah Office Park, 1001 Delilah Road, Egg Harbor Township, Atlantic County, New Jersey (Property), was owned by defendant Delilah Land Corporation. Delilah was and is a wholly owned subsidiary of defendant Chancellor Land Corporation. Chancellor was and is a wholly

owned subsidiary of defendant Security Savings Bank, SLA. Pursuant to the provisions of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) the Office of Thrift Supervision, by Order No. 92–510, dated December 4, 1992, declared Security Savings Bank, SLA insolvent and appointed Resolution Trust Corporation as Receiver for Security. (Defs.Br. at 4).

On January 23, 1989, Delilah and Fox & Lazo entered into a listing agreement (Listing Agreement) with respect to the rental of the Property. Under the terms of the Listing Agreement, Chancellor agreed to employ Fox & Lazo as its exclusive listing agent for purposes of obtaining a tenant to lease the Property; the term of the Listing Agreement was for the six-month period beginning January 23, 1989 and running through July 22, 1989. The Listing Agreement also provided that in the event that Chancellor decided to sell the Property during the term of the Listing Agreement, Chancellor would execute an appropriate Exclusive Listing Agreement with Fox & Lazo as agent.

On July 14, 1989, Edward Temple, President of Fox & Lazo, sent a letter (the Temple Letter) to Roy Hyman, Executive Vice President of Chancellor, proposing an arrangement whereby Fox & Lazo would market the Property for the sum of $4,200,000; and "Furthermore, Security Savings Bank agrees to pay Fox & Lazo, Atlantic Commercial Group a commission of $200,000.00 when a sale, exchange or joint venture of the specified property is effected by Fox & Lazo, Atlantic Commercial or by any person, firm or corporation." (Temple Letter, Defs.Ex. B).

On July 19, 1989, Roy Hyman sent a letter (the "Hyman Letter") to Edward Temple stating that:

> I received your letter dated July 14, 1989 regarding the sale of the Delilah Road Complex in Egg Harbor Township. We will only honor your registration of Avalon

---

**2.** The claims in plaintiff's complaint were stated in seven counts, of which only Counts One and Two remain. Count Three was a statutory claim under the New Jersey Consumer Protection Act at *N.J.S.A.* 56:8–2 against Security, Delilah and Chancellor, which was dismissed by Order of the Superior Court, Atlantic County, and is no longer before this Court upon removal. Counts Four through Seven were claims solely against co-defendants Millar and Avalon, which claims have been settled and dismissed.

Commercial Corporation solely for the amount of $4,200,000 as specified in your letter with a $200,000 commission. Furthermore, we will only honor any offers you bring to us prior to the expiration of your listing agreement on July 22, 1989 for a period of 90 days from that date. Any and all future offers after that date will not be protected for any commission unless registered with our office prior to the expiration date of your listing.

.    .    .    .    .

The above sale is subject to the approval of the Board of Directors of Security Savings Bank, SLA.

Hyman Letter, Defs.Ex. C.[3]

Plaintiff claims that John Millar, President of Avalon Commercial Corporation, was a timely registered sale prospect of Fox & Lazo, as evidenced by Temple's letter of July 22, 1989, to Hyman which listed "John Millar, President, Avalon Commercial Corporation" as a registered sales prospect. (Pl.Ex. 8.) Plaintiff asserts that Hyman recognized Millar's registration, as evidenced by a letter sent by Hyman to a second real estate firm, Siracusa Company, listing "John Millar, Avalon Commercial Corporation" as a sale prospect registered by Fox & Lazo. (Letter from Roy Hyman to John Buckley of Siracusa Co., July 28, 1989, Pl.Ex. 9.) Millar was the eventual purchaser of the property as explained below.

Negotiations between Delilah and John Millar ceased in August 1989 when no compromise could be obtained between Delilah's modified asking price of $3,800,000.00 and Avalon's offer of $3,000,000.00. Plaintiff continued to participate as a broker in these negotiations even after Delilah lowered the asking price. The ninety-day period after the July 22 expiration of the term of the Listing Agreement ended on October 20, 1989.

In the latter part of November 1989, Delilah entered into a contract for the sale of the Property with one Howard Needleman for the sum of $3,580,000.00. Due to Needleman's subsequent financial inability to complete the transaction, the contract of sale was mutually voided by Delilah and Needleman. (Letter from Howard Needleman to Roy Hyman, December 20, 1989, Defs.Ex. E.)

In December 1989, negotiations regarding the purchase of the Property resumed between Security and Millar when Hyman recontacted Millar. (Hyman Internal Memo dated Feb. 7, 1990, Pl.Ex. 14.) Although there is some dispute about who initiated the second contact, construing the facts in the light most favorable to the non-moving party, these negotiations were renewed by Roy F. Hyman or Ronald Seagraves (President of Security Savings Bank, SLA) in December 1989, without apprising Fox & Lazo.

In a letter of January 18, 1990, Seagraves presented Millar with the terms of "a counter-proposal to your offer of August 4, 1989" which included a $3,300,000.00 purchase price for the Property. (Letter from Seagraves to Millar, Jan. 18, 1990, Pl.Ex. 10.) In his letter of February 6, 1990, Millar responded with a "final offer" of $3,150,000.00 for the Property (Letter from Millar to Seagraves, Feb. 6, 1990, Pl.Ex. 11.) Millar's offer was accepted the same day by Seagraves. (Letter from Seagraves to Millar, Feb. 6, 1990, Pl.Ex. 12.) The defendants completed the transaction and closed title on the subject property on June 30, 1990 for the sum of $3,150,000.00. On October 4, 1990, Fox & Lazo filed the complaint against Security, Delilah, Chancellor, John Millar, and Avalon Commercial Corporation, in the Superior Court of New Jersey, for, *inter alia*, the recovery of the brokerage commission, more than two years before the RTC was appointed as Receiver for the failed Security.

*Discussion*

I. *Summary Judgment Standard*

The standard for granting summary judgment is a stringent one. A court may grant

---

**3.** According to Roy Hyman's certification in support of the motion for summary judgment "neither the Listing Agreement not the Hyman Letter was ever approved or authorized by the board of directors of Security Savings Bank, SLA. There is nothing in the minutes of meetings of that board of directors which would reflect any such approval or authorization." (Certification of Roy Hyman, July 21, 1993, Defs.Ex. F).

summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In light of these pronouncements, this court will consider if the defendant has demonstrated that judgment as a matter of law is appropriate.

## II. *D'Oench Duhme Doctrine and 12 U.S.C. § 1823(e)*

Defendants contend that due to the circumstances of receivership, plaintiff's claim against Security and its assets, Delilah and Chancellor, is barred in its entirety because the claim does not meet the requirements of the *D'Oench Duhme* doctrine and 12 U.S.C. § 1823(e), as amended by the Financial Institution Reform, Recovery, and Enforcement Act ("FIRREA"), enacted August 9, 1989.

Thus, this court must determine, as a threshold issue, whether, based on the language of section 1823(e) and section 1821(d)(9)(A), as a matter of law, the requirements of section 1823(e) apply to plaintiff's claim against Security for the payment of the real estate brokerage commission.

The seminal case, *D'Oench, Duhme & Co., Inc. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), established the federal common law doctrine "preventing borrowers from raising 'secret agreements' in defense to actions to enforce ostensibly unconditional obligations they owe to a bank that the Federal Deposit Insurance Corporation (FDIC) has taken over." *Adams v. Madison Realty & Dev., Inc.*, 937 F.2d 845, 851 (3d Cir.1991). The Federal Deposit Insurance Act of 1950, included a provision, found at 12 U.S.C. § 1823(e), generally regarded as codifying the result reached in *D'Oench, Duhme*. *See Adams*, 937 F.2d at 852; *Federal Deposit Ins. Corp. v. Blue Rock Shopping Ctr.*, 766 F.2d 744, 753 (3d Cir.1985).

*D'Oench, Duhme* was a securities dealer that executed promissory notes payable to a bank so that the bank would not have to show a loss on its books arising from the default of some bonds the bank had purchased. The bank gave D'Oench, Duhme a receipt for the promissory notes constituting a side agreement that the bank would not demand payment upon the notes. When the bank failed, the FDIC acquired the notes and brought a collection action against D'Oench, Duhme, which asserted as a defense the side agreement under which the bank had agreed not to enforce the notes. The Supreme Court found that federal law protected the

FDIC against undisclosed and fraudulent agreements not plainly appearing on the face of the obligation. 315 U.S. at 461, 62 S.Ct. at 681. Such a side agreement assisted the bank in misleading bank-examining authorities, and D'Oench, Duhme was therefore estopped from asserting such a defense against the FDIC. The Third Circuit in *Adams* has summarized the *D'Oench, Duhme* rule as stating that "no agreement between a borrower and a bank which does not plainly appear on the face of an obligation or in the bank's official records is enforceable against the FDIC [or the RTC]." 937 F.2d at 852.

■ If *D'Oench, Duhme* itself were our only guide, the alleged real estate commission agreement in the present case would not be affected in any way by the *D'Oench, Duhme* doctrine, because the plaintiff merely performed professional services for the failed bank and is not an obligor upon any note or monetary obligation to the bank. Because *D'Oench, Duhme* is a doctrine of estoppel against borrowers or other obligors who owe upon a debt to the bank, in its original form the doctrine does not reach direct contractual claims *against* the bank for services rendered by no-obligor claimants such as plaintiff here.

In 1950, however, Congress enacted an amendment to the Federal Deposit Insurance Act, 64 Stat. 889, at 12 U.S.C. § 1823(e), which provided:

> No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.

That provision was "generally thought to codify the result reached in *D'Oench, Duhme,*" *Adams,* 937 F.2d at 852. The Supreme Court was called upon to interpret the meaning of "agreement" in section 1823(e) in *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). The Langleys were obligors upon a note which they had used to purchase real estate. They defaulted upon the note. When the bank sued to enforce, the Langleys claimed that the bank had made misrepresentations concerning the property's acreage and mineral rights. When the bank failed, the FDIC pursued the lawsuit, urging that § 1823(e) barred precisely the sort of an obligor's claim of unwritten misrepresentations that the Langley's were asserting in an effort to defeat the FDIC's interest.

The *Langley* Court unanimously found that an "agreement" under section 1823(e) includes the alleged misrepresentations by the failed bank regarding acreage and mineral rights, holding:

> A condition to payment of a note, including the truth of an express warranty, is part of the "agreement" to which the writing, approval and filing requirements of 12 U.S.C. § 1823(e) attach. Because the representations alleged by [the Langleys] constitute such a condition and did not meet the requirements of the statute, they cannot be asserted as defenses here.

*Langley,* 484 U.S. at 96, 108 S.Ct. at 403. Quite plainly, the Supreme Court's rationale in *Langley* invests section 1823(e) with a threefold purpose of protecting the FDIC from unknown aspects of *loan* transactions, because the Court noted:

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.... Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained *seemingly unqualified notes that are in fact subject to undisclosed conditions.*

> A second purpose of § 1823(e) is implicit in the requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also

have been executed and become a bank record "contemporaneously" *with the making of the note* and have been approved by officially recorded action of the bank's board or loan committee. These latter requirements ensure mature consideration of *unusual loan transactions* by senior bank officials, and *prevent fraudulent insertion of new terms,* with the collusion of bank employees, when a bank appears headed for failure....

... We can safely assume that Congress did not mean "agreement" in § 1823(e) to be interpreted so much more narrowly than its permissible meaning as to disserve the principles of the leading case [*D'Oench, Duhme* ] applying that term to FDIC-acquired notes. Certainly, *one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment* has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme* ) or of the truthfulness of a warranted fact.

*Langley,* 484 U.S. at 91–93, 108 S.Ct. at 391 (emphasis added). Thus, *Langley* interprets section 1823(e) as an expansion of *D'Oench, Duhme,* to the extent that the innocence of the borrower and the knowledge of the FDIC regarding the unwritten promises are both immaterial. Section 1823(e), as interpreted by *Langley,* applies to notes and obligations and precludes an obligor's assertion of an unwritten and unrecorded condition, promise, or representation against the FDIC or RTC, irrespective of the borrower's innocent reliance upon the representations or even the FDIC/RTC's knowledge of the promises. Nothing in *Langley* would indicate, however, that an "agreement" under section 1823(e) means a real estate broker's commission agreement for sale of property, completed years earlier and unrelated to any obligor relationship of the claimant to the failed bank.

Subsequent to *Langley,* Congress amended section 1823(e) to enlarge the reach of that section to assets acquired by the FDIC or RTC in both its corporate or receiver capacities under both sections 1823 and 1821.

*Adams,* 937 F.2d at 854. Thus, as presently written, section 1823(e) states:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or under section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously from the time of its execution, an official record of the depository institution.

The Third Circuit in *Adams* applied this statute to determine "whether investors who sign unconditional promissory notes can raise fraud in the inducement as a defense to enforcement of those notes by the Resolution Trust Corporation (the "RTC"), where the RTC acquired the notes by taking over a bank that purchased them on the secondary market." *Adams,* 937 F.2d at 849–50. The plaintiffs sought rescission of the notes that they had made payable to one of three originator banks as part of a tax shelter. The notes were acquired by Empire of America Federal Savings Bank, and the plaintiffs (who were obligors upon the notes) claimed that the predecessor banks had made fraudulent inducements to plaintiffs in connection with these notes. The Third Circuit held that these notes, which were acquired by RTC as receiver for failed Empire, were "assets" under section 1823(e), and that RTC's interest therein could not be defeated by the alleged fraudulent inducement by the predecessor banks, because such an inducement constitutes an "agreement" of the type section 1823(e) requires to be in a contemporaneous writing, duly approved by the di-

rectors and filed in the institution's official records. Therefore, the court agreed that "the plaintiffs cannot assert their claims or defenses against the RTC under 12 U.S.C. § 1823(e) and the *D'Oench, Duhme* doctrine." 937 F.2d at 851. The court held, "The word 'agreement' in section 1823(e) is not limited to express agreements between a bank and a borrower. Rather, an 'agreement' includes any warranty on which the performance of a party is conditioned." *Id.* at 857. Because the "representations and warranties are promises, the truth of which are conditions precedent to the plaintiffs' obligations to repay the notes," they are "agreements" under section 1823(e). *Id.*

■ In the present case, unlike *D'Oench, Duhme, Langley,* and *Adams,* the plaintiffs do not seek to defeat the FDIC/RTC's interests in an asset. Plaintiff has no obligation to the bank arising from this brokerage transaction. Likewise, under section 1823(e), the RTC has acquired no "asset" as receiver, as the failed bank sold its interest in the real estate in a transaction concluded two years before the RTC's takeover. If Congress intended that "an interest in an asset acquired by [RTC]" means the general funds of the failed bank, it did not choose words to convey such a meaning. The broker's commission contract claimed by plaintiff is itself not an "asset" acquired by RTC, but it is rather an alleged liability of the failed bank to a past provider of services. Under the *Adams* test, the broker's contract is not a "warranty on which the performance of a party is conditioned," *Adams,* 937 F.2d at 857, because plaintiff is not alleged to owe any performance to the failed bank, nor does plaintiff seek to interpose this alleged contract as a condition upon such performance, again unlike the plaintiffs in *Adams* who signed unconditional promissory notes and sought to erect an estoppel arising from fraudulent inducements by the failed bank's predecessors.

Plaintiff's reliance on *Beener v. LaSala,* 813 F.Supp. 303 (D.N.J.1993), is well-founded in interpreting *D'Oench, Duhme* and section 1823(e).[4] In *Beener,* providers of services in connection with the offering of partnership interests brought action against third-generation subsidiaries of failed bank, seeking to enforce an alleged agreement to pay brokerage commissions and fees for services rendered. *Id.* at 304. The defendants in *Beener* moved for summary judgment on the grounds that the obligation was barred by the *D'Oench, Duhme* doctrine codified at 12 U.S.C.A. § 1823(e).[5]

The Honorable Harold A. Ackerman held that the *D'Oench, Duhme* doctrine did not apply in an action seeking to enforce a direct obligation for services rendered to the subsidiary because there were no secret or side agreements to mislead authorities involved, and the case did not concern the "validity and enforceability of a particular debt or monetary obligation owed to a failed bank," *Beener,* 813 F.Supp. at 308 (quoting *Vernon v. Resolution Trust Corp.,* 907 F.2d 1101, 1107 (11th Cir.1990), but rather enforcement of and alleged agreement to pay brokerage commissions and fees for services rendered in connection with the offering of partnership interests. *Id.* at 309.

The difference in this type of obligation, which kept it from the sweeping ambit of § 1823(e), was that the plaintiffs were merely seeking to enforce a straightforward obligation allegedly owed *by* the failed bank's third-generation subsidiary, and were not obligors attempting to "diminish or avoid their liability on a debt or other obligation owed to the bank." *Id.; see also Agri Export Co-op. v. Universal Sav. Ass'n,* 767 F.Supp. 824, 832 (S.D.Tex.1991) (*D'Oench* should not be applied when the agreement sought to be avoided "is what might be characterized as a pure obligation of the failed bank or savings and loan association.") Rather, Section 1823(e) is

---

4. As discussed below, however, *Beener* is not dispositive of the issues surrounding plaintiff's claim under § 1821(d)(9)(A) as discussed in Part III, *infra.*

5. Judge Ackerman's opinion in *Beener* did not address the application of § 1821(d)(9)(A) to his

case, nor did the principal cases on which *Beener* relies discuss § 1821(d)(9)(A), *see Vernon v. RTC,* 907 F.2d 1101 (11th Cir.1990); *FDIC v. Blue Rock Shopping Ctr. Inc.,* 766 F.2d 744, 754 (3d Cir.1985); and *Agri Export Co-op. v. Universal Savings Ass'n,* 767 F.Supp. 824, 832 (S.D.Tex. 1991).

only a bar to "defenses and claims which would diminish the value of a particular record asset held by the FDIC, such as a note or mortgage." *Agri*, 767 F.Supp. at 832.

If *D'Oench* and Section 1823(e) were to be applied as expansively as defendants urge, liability on all obligations of the failed institution, as well as obligations of all the institution's subsidiaries, not meeting the requirements of *D'Oench* or Section 1823(e) could be avoided. This was not the result intended by *D'Oench* and Section 1823(e).

*Beener*, 813 F.Supp. at 310.

██ Similarly, in this case, the plaintiff is seeking to enforce a direct obligation for the payment of a brokerage commission incurred *by* the subsidiaries of Security. This is not a case involving an unscrupulous or secretive side agreement by an obligor of the bank, in fact there is no dispute as to the "nature" of the claim in this action. Section 1823(e) and *D'Oench, Duhme* were designed to prevent borrowers from alleging unrecorded or otherwise irregular agreements to nullify the effect of written agreements pertaining to assets acquired by the RTC, not to bar potential general creditors of the bank and subsidiaries in transactions unrelated to acquired assets. Congress has instead addressed the requirements of direct claims against failed thrifts elsewhere, and most particularly, under section 1821(d)(9)(A), as discussed below. Where Congress has spoken to the substantive issue, any judicial expansion of the *D'Oench, Duhme* doctrine arising at federal common law would be inappropriate.

██ Therefore, this court agrees that the proper application of § 1823(e) was not intended by Congress to sweep so broadly beyond agreements between the bank and borrowers. While § 1823(e) may extend to preclude enforcement of any warranty upon which the performance of a party is conditioned unless the statutory procedures have been met, neither the language nor the logic of § 1823(e) precludes plaintiff's claim herein.

### III. *Compliance of Affirmative Claim with 12 U.S.C. § 1821(d)(9)*

██ The finding that § 1823(e) does not bar plaintiff's claim does not end our inquiry because we must consider the requirements for an agreement as a basis for a claim against the RTC as determined by Congress in 12 U.S.C. § 1821(d)(9). Section 1821 defines the powers and duties of the RTC as a conservator or receiver, and it erects conditions upon the types of claims that can be recognized by RTC and the procedures for presenting an deciding such claims. The FIRREA claims procedure in § 1821 has been held to be exclusive, and Congress withdrew jurisdiction from all courts over any claim to a failed bank's assets that is made outside the procedures set forth in the Act. *FDIC v. Shain, Schaffer & Rafanello*, 944 F.2d 129 (3d Cir.1991). In *Shain*, the claims of the failed bank's former law firm for payment and to enforce its lien on the bank's files was subjected to the statutory claims procedure of § 1821 and the court was without jurisdiction to adjudicate the claim. *Id.*

An action to recover against the RTC upon a service contract for services performed for the failed thrift is governed by 12 U.S.C. § 1821(e)(7)(A), which states:

> In the case of any contract for services between any person and any insured depository institution for which the Corporation has been appointed conservator or receiver, any claim of such person for services performed before the appointment of the conservator or the receiver shall be—
>
> (i) a claim to be paid in accordance with subsections (d) and (i) of this section; and
>
> (ii) deemed to have arisen as of the date the conservator or receiver was appointed.

The pre-appointment services contract, such as the real estate broker's agreement alleged here, is thus a claim to be paid if the conditions of § 1821(d) & (i) are satisfied. Subsection 1821(i), pertaining to valuation of claims in default, is not presently relevant, but subsection 1821(d) is highly relevant, as now discussed.

Under subsection 1821(d)(9), an agreement which is the basis of a claim against the RTC, including a pre-appointment service agreement, must meet the formalistic requirements of section 1823(e), *supra*, to be paid. Subsection 1821(d)(9)(A) states:

Except as provided in subparagraph (B), any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially compromise, a claim against the receiver or the Corporation.

Subparagraph (B), inapplicable here, creates an exception to the § 1823(e)(2) requirement of contemporaneous execution in the case of certain extensions of credit between other federal banks and the insured depository institution.

Defendants argue that subsection 1821(d)(9)(A) bars the present claim against the RTC and the subsidiaries of the failed thrift because the alleged broker's agreement does not meet the § 1823(e) requirements of a contemporaneous writing ratified by the failed thrift's board and maintained in the thrift's official records. This court agrees that subsection 1821(d)(9)(A)'s reference to "the requirements set forth in section 1823(e) of this title" means that the four procedural requirements of section 1823(e) must be met for an agreement to form the basis of a claim. Even though the broker's commission contract at issue here is not an "agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it ... as receiver of [a failed thrift]" under section 1823(e), as discussed above, it is nonetheless squarely within the section 1821(d)(9)(A) definition of an "agreement ... form[ing] the basis of, or substantially compris[ing], a claim against the receiver." Congress has applied this provision to service contracts with failed thrifts for the obvious purpose of assuring that affirmative claims against the failed thrift arising from contracts be reflected upon the bank's books, *see Jackson v. FDIC*, 981 F.2d 730 (5th Cir.1992) (claim based upon alleged breach of agreement by bank to lend money is barred by § 1821(d)(9)(A)); *North Ark. Med. Ctr. v. Barrett*, 962 F.2d 780 (8th Cir.1992) (claim based upon bank's breach of agreement to

pledge securities as collateral for jumbo certificates of deposit is barred by § 1821(d)(9)(A)); *Tuxedo Beach Club Corp. v. City Fed. Sav. Bank*, 749 F.Supp. 635, 645 (D.N.J.1990) ("Where the success of an asserted tort claim hinges on an agreement which does not satisfy the requirements of section 1823(e) ... the claim must fail under the plain meaning of section 1821(d)(9)(A)."). No cases interpreting this subsection hold to the contrary.

In interpreting the meaning of § 1821(d)(9)(A), and its clear application to direct claims arising from service contracts with a failed thrift, the reach of the *D'Oench, Duhme* doctrine is irrelevant. This subsection expresses the unambiguous intent of Congress that a contract claim against the RTC may arise only from an agreement that meets the requirements of regularity sufficient to appear on the bank's books, namely that the agreement be "in writing," "executed ... contemporaneously" with the acquisition of the asset, *i.e.*, at the time of the performance of the services, "approved by the board of directors ..., which approval shall be reflected in the minutes of said board," and maintained "continuously ... [as] an official record of the depository institution," under the requirements for approval and recordation contained in § 1823(e)(1)–(4), *supra*. "If the intent of Congress is clear, that is the end of the matter, for the court ... must give effect to the unambiguously expressed intent of Congress," *Norfolk & W. Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991).

Assuming for the sake of argument that the Hyman letter of July 19, 1989, states the terms of the underlying contract with Fox & Lazo, and assuming that Hyman was acting on behalf of the failed thrift as well as its subsidiaries Delilah and Chancellor, all as alleged by plaintiff, it is clear nevertheless that the alleged agreement was never approved by the Board of Security Savings SLA, nor was the agreement reflected in the minutes of the Board, nor was the Hyman letter maintained upon the books and official records of Security Savings. Therefore, as a matter of law, plaintiff can not prevail upon

its claim against the RTC as Receiver for Security Savings Bank SLA for a broker's commission arising under this alleged agreement that fails to meet the requirements of section 1821(d)(9)(A).

■ Likewise, section 1821(d)(9)(A) precludes the claims asserted in Counts One and Two against Security's wholly-owned subsidiaries, Chancellor and Delilah. The complaint and plaintiff's allegations in the motion practice (see Pl.Br. at 28–30) treat Security, Delilah, and Chancellor as a common entity for purposes of this transaction. Subsidiaries of a failed thrift which were engaged with the failed thrift in the underlying real estate agreement, in a sale subject explicitly to the approval of the failed thrift's Board, are similarly protected by section 1821(d)(9)(A)'s claim requirements. If section 1821(d)(9)(A) did not raise the same requirements for presenting a claim against a wholly-owned subsidiary of the failed thrift in this circumstance, then a creditor could defeat the operation of FIRREA on a claim barred against the thrift by asserting the claim against the thrift's wholly-owned subsidiary. Such a result is untenable where plaintiff alleges that Security Savings was the major participant and motivating force in the underlying real estate commission agreement. Section 1821(d)(9)(A)'s bar of the present agreement as against Security Savings likewise bars its enforcement against the participating wholly-owned subsidiaries, lest the failed thrift's assets (Delilah and Chancellor) be depleted by claims based on an irregular, non-recorded agreement.

### Conclusion

Defendants' motion for summary judgment on Counts One and Two of the Complaint is granted.